UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAMELA HILL, et al., | Case No. 24-cv-00336-JSC |
| Plaintiffs, | |
| v. | **ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| PACIFIC MARITIME ASSOCIATION, et al., | Re: Dkt. Nos. 147, 177 |
| Defendants. | |

Plaintiffs, unionized California dockworkers, allege Defendants violated California law and several local ordinances by failing to pay them and the putative class sick pay.  Now pending before the Court is Defendants' motion for summary judgment.  (Dkt. No. 147.)[1]  Defendants contend the Employee Retirement Income Security Act ("ERISA") preempts Plaintiffs' sick leave and retaliation claims.  After carefully considering parties' submissions, and having the benefit of oral argument on May 19, 2026, Defendants' motion is GRANTED in part and DENIED in part.  Drawing all reasonable inferences from the summary judgment record in Plaintiffs' favor, it is undisputed Plaintiffs' sick leave claims require Defendants to create an ERISA plan or modify already existing ERISA plans and are therefore preempted.  But Defendants have not met their burden of proving the retaliation claims are preempted as a matter of law.

**SUMMARY JUDGMENT RECORD**

**A. Undisputed Facts**

The industry involving the loading and unloading of cargo from ships docked at West Coast ports is unique.  It begins with Defendant Pacific Maritime Association ("PMA"), a

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

"California non-profit mutual benefit corporation, established and governed by its member companies." (Dkt. No. 147-1 ¶ 2.) "Its members include more than 50 for-profit stevedore companies, marine terminal operators, and cargo-handling-equipment maintenance contractors who employ longshore workers, marine clerks, walking bosses/foremen, and watchmen (collectively 'dockworkers') to perform various jobs related to loading and unloading cargo from ships at port facilities in California, Oregon, and Washington." (*Id*.)  On behalf of its members, PMA negotiates with the International Longshore and Warehouse Union ("ILWU"), which represents dockworkers. (*Id.*; *see also* Dkt. No. 147-2 ¶ 4.)

The dockworkers do not work for any particular PMA member.  Instead, twice a day, dispatchers apply the collective bargaining agreements and local dispatch rules to assign jobs to eligible workers who made themselves available; dockworkers have discretion to decide when they will seek work from dispatch subject to minimum availability requirements. (Dkt. No. 147-1 ¶ 4.)  And workers can still decline jobs offered through dispatch. (*Id.*)  Once a worker accepts a job offered by dispatch, the worker reports "to port facilities where PMA member companies supervise and direct their job performance." (*Id*.)  Most dispatched jobs last for one shift only. (*Id*.)  Once a job ends, the worker may seek more work. (*Id*.)

Given this work arrangement, "most West Coast dockworkers perform work for several employers in the same industry interchangeably, based on when they choose to make themselves available to work and fluctuating work opportunities." (*Id.* ¶ 5.)  So, each dockworker might work for several employers within a single workweek. (*Id.*)  Indeed, each named Plaintiff worked for multiple PMA member companies each year as the following chart summarizing PMA's payroll data illustrates:

| | Number of PMA Member Companies Worked For | | | | | | |
|---|---|---|---|---|---|---|---|
| Plaintiff | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | Total (2019-2024) |
| Blackmon, LaTina | 6 | 5 | 4 | 2 | 3 | 5 | 9 |
| Brown, Cory J | 9 | 10 | 14 | 15 | 16 | 13 | 17 |
| Gavin, Royce D | 7 | 12 | 14 | 15 | 13 | - | 16 |
| Graves, Olando | 4 | 3 | 3 | 3 | 7 | 5 | 8 |
| Green, Harold | 8 | 9 | 9 | 6 | - | - | 11 |
| Hill, Pamela | 5 | 5 | 6 | 6 | 6 | 5 | 6 |
| Hughes, Kimberly | 5 | 3 | 3 | 3 | 7 | 5 | 8 |
| Johnson, Rhonda A | 5 | 5 | 5 | 6 | 6 | 6 | 6 |
| Johnson, Stephen J | 11 | 10 | 9 | 6 | 7 | 9 | 12 |
| Ruffin, Shyraun | 7 | 5 | 4 | 5 | 9 | 9 | 15 |
| Seals, Sheila | 10 | 4 | 3 | 4 | 2 | - | 11 |
| Shaw, Darryl B | 7 | 6 | 7 | 8 | 9 | 5 | 11 |
| Stewart, Jeri E | 5 | 5 | 6 | 6 | 6 | - | 6 |
| Thompson, Danielle | 8 | 5 | 7 | 16 | 17 | 10 | 19 |
| Williams, Paul E | 8 | 4 | 5 | 5 | 5 | - | 11 |
| Young, Derrick W | 5 | 4 | 7 | 4 | 5 | 3 | 9 |

(*Id.* ¶ 6.)

PMA also serves as a centralized payroll agent for its member companies. (*Id.* ¶¶ 7-8.) "[I]t collects time-card information and funds for wages from its member companies, issues aggregated weekly paychecks to dockworkers, and maintains dockworker payroll records." (*Id.* ¶ 8.) "PMA does not use its own assets to fund dockworkers' payroll; all funds originate from the member companies." (*Id.*) "The employers remit the funds to a separate bank account maintained by PMA, and PMA issues aggregated wage payments to each dockworker[.]" (*Id.*) "Without this centralized payroll system, each workweek dockworkers would have to collect separate paychecks directly from each of their employers." (*Id.* ¶ 9.)

PMA, on behalf of its member companies, and the Union have agreed to several paid leave benefits, all of them administered through PMA. These plans include:

- COVID sick pay,
- vacation pay,
- holiday pay,
- supplemental disability pay, and
- certain pay guarantees.

(Dkt. No. 147-3 ¶¶ 4, 6.) To funds these benefits, PMA member companies contribute to

3

"dedicated trust funds established for each type of leave." (*Id.* ¶ 5.)  Contribution formulas are "based on measurable indicators such as the number of labor hours worked ('man hours') or cargo moved ('tonnage') by each company, and have been approved by the Federal Maritime Commission.  (*Id.*, *see generally id.* at 10-424 (agreements and documents illustrating PMA's ERISA plans).)  PMA does not pay leave benefits to dockworkers from its (or any member company's) assets, "all" benefits are administered and paid through these ERISA-governed trusts. (*Id.* ¶ 15; *see, e.g.*, *id.* ¶¶ 8, 12, 13; *id.* at 35-65 (COVID sick pay trust agreement and IRS Form 5500 identifying the plan as an ERISA-governed plan), 77-127 (vacation benefits trust agreement, plan details, and IRS Form 5500), 150-183 (holiday pay trust agreement and IRS Form 5500), 232-284 (pay guarantee plan trust agreement and IRS Form 5500).)  The benefit plans operate coast-wide, providing the same paid leave benefits to dockworkers in California, Oregon, and/or Washington.  (*See id.*)

### B.  Plaintiffs' Claims

#### 1.  Sick Leave

Plaintiffs assert claims under both California's Healthy Workforce Healthy Families Act ("HWHFA"), and sick leave ordinances adopted by Los Angeles, Oakland, San Francisco, and San Diego.

##### a.  HWHFA

The HWHFA requires covered employers to provide paid sick leave to California employees who work "for the same employer for 30 or more days within a year from the commencement of employment."  Cal. Lab. Code § 246(a)(l).  Paid sick leave accrues at the rate of one hour per every 30 hours worked, subject to certain exceptions, but an employer must provide at least five days or 40 hours of paid sick leave per year, whichever is more.  *Id.* § 246(b)(1)-(4).

##### b.  Local Ordinances
###### i.  Los Angeles

The Los Angeles Municipal Code requires a covered employer to provide paid sick leave to any employee who "works in the City for the same Employer for 30 days or more within a year from the commencement of employment."  L.A. Municipal Code § 187.04(A).  Covered

United States District Court
Northern District of California

United States District Court
Northern District of California

employers must provide either 48 hours of sick leave at the beginning of each year of employment or permit employees to accrue one hour of sick leave for every 30 hours worked. *Id.* § 187.04(D). Qualifying employees may begin accessing their accrued sick time after their 90th day of employment. *Id.* § l87.04(C).

### ii.    **Oakland**

The Oakland Municipal Code requires covered employers to provide paid sick leave to employees who work at least two hours in a particular week in Oakland. Oakland, Cal. Municipal Code § 5.92.010. Like San Francisco, paid sick leave accrues at the rate of one hour per 30 hours worked, carries over year to year, is capped at 72 hours, and qualifying employees may begin accessing their accrued sick time after their 90th day of employment. *Id.* § 5.92.030.

### iii.    **San Francisco**

The San Francisco ordinance requires covered employers to provide paid sick leave to employees who work in San Francisco. S.F. Lab. & Empl. Code Art. 11, § 11.2; S.F. O.L.S.E. Rule 6.3. Paid sick leave accrues at the rate of one hour per 30 hours worked. S.F. Lab. & Empl. Code Art. 11, § 11.3(b). It carries over year to year but is capped at 72 hours. *Id.* Qualifying employees may begin using accrued sick time after their 90th day of employment. *Id.* § 11.4(d).

### iv.    **San Diego**

The San Diego ordinance applies to employees who worked at least two hours in a particular week in San Diego. San Diego, Cal. Municipal Code Ch. 3, Art. 9, Div. 1, § 39.0104(a). Paid sick leave accrues at the rate of one hour for every 30 hours worked with in San Diego. *Id.* § 39.0105(b). Accrued paid sick leave carries over year to year, but may be capped at 80 hours. *Id.* § 39.0105(b), (i). Employers may also limit the use of accrued paid sick leave to 40 hours per year. *Id.* § 39.0105(b). Qualifying employees may begin accessing their accrued sick time after their 90th day of employment. *Id.* § 39.0105(d).

### c.    **Plaintiffs' Sick Leave Demand**

Plaintiffs "seek a mandatory injunction requiring Defendants to implement a sick pay policy […] in accordance with California and local laws" (Dkt. No. 137 ¶ 202), along with restitution of past sick pay owed under California law and the various ordinances. (*Id.* ¶ 201; *see*

*also id.* ¶ 74 ("Defendants should be compelled to implement a sick pay policy for all of their employees, in accordance with California and local laws.").)

### 2. Pandemic Pay Retaliation Claim

Plaintiffs also claim Defendants created a $70 million Pandemic Appreciation Pay fund for all dockworkers, except for 600 Local 26 Watchmen.  (*Id.* ¶ 148.)  The one-time payment amounted to approximately $3,000 per dockworker.  (*Id.* ¶ 153.)  Plaintiffs contend Defendants' exclusion of Local 26 Watchmen from the Pandemic Appreciation Pay was in retaliation for over 200 complaints watchmen filed with the California Labor Commission regarding the lack of sick leave.  (*Id.* ¶ 154.)  They seek an award of Pandemic Appreciation Pay to the class. (*Id.* ¶¶ 74, 76(e), Prayer for Relief.)

***

Defendants move for summary judgment on the grounds ERISA preempts all of Plaintiffs' claims.

### DISCUSSION

 "[S]tate and local laws enjoy a presumption against preemption when they 'clearly operate[ ] in a field that has been traditionally occupied by the States.'"  *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 546 F.3d 639, 647–48 (9th Cir. 2008) (quoting *De Buono v. NYSA–ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997) (internal quotation marks omitted)).  As sick leave (health) is a field the States traditionally occupied, the Court's ERISA preemption analysis is informed by this presumption.  *Id.*

ERISA expressly preempts "any and all State laws" that "relate to" an "employee benefit plan." 29 U.S.C. § 1144(a).  This provision is "one of the broadest preemption clauses ever enacted."  *Aloha Airlines, Inc. v. Aliue*, 12 F.3d 1498, 1501 (9th Cir. 1993) (cleaned up); *see also Pilot Like Ins. Co. v. Dedeaux*, 418 U.S. 41, 45-46 (1987) ("We have observed in the past that the express pre-emption provisions of ERISA are deliberately expansive.").  ERISA defines "employee welfare benefit plan" as a "plan, fund, or program" established by one or more employer or employee organizations to provide benefits, such as payments "***in the event of sickness***, accident, [or] disability." 29 U.S.C. § 1002(1) (emphasis added).

United States District Court
Northern District of California

I.    **Plaintiffs' Paid Sick Leave Claims**

A. **Plaintiffs' Sick Leave Claims Require Defendants to Adopt an ERISA Plan**

ERISA preempts "a state statute requiring the establishment of a benefit plan." *Fort Halifax Packing Co.*, 482 U.S. 1, 12-13 (1987); *see also Aloha Airlines*, 12 F.3d at 1505 (holding a state law "relate[d] to" an ERISA plan and was therefore preempted because it required the defendant to create a separate benefit plan); *Standard Oil Co. v. Agsalud*, 633 F.2d 760, 763 (9th Cir. 1980), aff'd, 454 U.S. 801 (1981) (holding ERISA preempted a state law requiring employers to adopt healthcare plans with certain specified features); *Simas v. Quaker Fabric Corp. of Fall River*, 6 F.3d 849, 852 (1st Cir. 1993) ("a state statute that obligates an employer to establish an employee benefit plan is itself preempted even though ERISA itself neither mandates nor forbids the creation of plans"). So, Plaintiffs' unsupported assertion ERISA cannot apply to or preempt the absence of a plan (Dkt. No. 137 ¶ 80), is legally incorrect.

Here, Plaintiffs contend California state and local laws require Defendants to adopt a paid sick leave plan, that is, an employee welfare plan within the meaning of ERISA. As a result, their sick leave claims are related to an ERISA plan and are preempted. Indeed, Plaintiffs expressly allege Defendants "could have set up an ***ERISA*** sick pay plan in the same way as they have done for vacation pay, holiday pay and COVID-19 pay." (*Id.* ¶ 82 (emphasis added).) And the record reflects "all" other dockworkers' paid leave plans are ERISA plans. (Dkt. No. 147-3 ¶¶ 8, 12, 13, 15; *see id.* at 35-65, 77-127, 150-183 (trust agreements and IRS forms identifying Defendants' COVID sick pay, vacation benefits, and holiday pay plans as governed by ERISA).)

B. **The Payroll Practice Exemption Does Not Apply as a Matter of Law**

Plaintiffs' insistence Defendants could adopt a sick leave plan that falls within ERISA's payroll practice exemption is unpersuasive. The payroll practice exemption applies to a "payment of an employee's normal compensation, out of the employer's general assets, on account of periods of time during which the employee is physically or mentally unable to perform his or her duties or is otherwise absent for medical reasons (such as pregnancy, a physical examination or psychiatric treatment)." 29 C.F.R. § 2510.3-1(b)(2). According to Plaintiffs, once PMA pays sick leave, it "can then pass along the cost proportionally to each Defendant based on hours employees

7

worked for each." (Dkt. No. 137 ¶ 81.) In other words, Defendants can comply with the sick leave laws without creating an ERISA plan. Plaintiffs' argument is not supported by the summary judgment record or caselaw.

First, the record does not include evidence that supports a finding any defendant could pay sick leave out of its general assets. It is undisputed "PMA does not use its own assets to fund dockworkers' payroll; all funds originate from the member companies." (Dkt. No. 147-1 ¶ 8.) In other words, PMA does not have its own "general assets," 29 C.F.R. § 2510.3-1(b)(2); it collects money from its members which it uses to pay the wages owed by its member companies, and it established separate funds which collect contributions for payment of paid leave benefits through ERISA plans for each type of leave. So, any sick leave PMA pays would come from its members.

Second, given the nature of the dockworkers' employment assignments, sick leave would have to be administered through a sick leave plan in which the PMA member companies pay into a fund and then use some formula for determining how to allocate paid sick leave payments when a dockworker does not make herself available to dispatch due to sickness. (*See* Dkt. No. 174-3 ¶ 5 (contrasting formulas used for each type of leave).) Unlike wages, which can be attributed to the particular employer for whom the dockworker performed tasks on a certain day, a dockworker taking sick leave is not taking leave from any particular employer, at least much of the time. And, since ordering Defendants to comply with the sick leave laws would require them to set up a plan and a separate fund to which the employers contribute to pay for sick leave benefits, the payroll practice exemption cannot apply. It is thus unsurprising Plaintiffs cannot cite a single case—or even an actual example—of dockworker benefits being paid from anything other than an ERISA plan.

In *Massachusetts v. Morash*, 490 U.S. 107 (1989), the Supreme Court held an employer's payment of employees' vacation benefits from the employer's "general assets" was an exempted payroll practice under 29 C.F.R. § 2510.3-(1)(b)(3) and therefore did not implicate ERISA. *Id.* at 119–20. But, importantly, *Morash* also observed "the creation of a separate fund to pay employees vacations benefits" would be subject to ERISA, as would the creation of a "separate fund […] by a group of employers" for the benefit of employees "who regularly shift their jobs

8

from one employer to another." *Morash*, 490 U.S. at 114, 120.

In *Alaska Airlines, Inc. v. Oregon Bureau of Lab.*, 122 F.3d 812 (9th Cir. 1997), for example, Alaska Airlines established a fund to pay compensation in the event of sickness, that is, sick leave pay. *Id.* at 813–14. But it wanted to pay employees for their sick leave in the same paycheck it paid regular wages. So, Alaska paid the sick leave to the employee from its general assets along with the wages, and then it sought reimbursement of what it paid from the sick leave fund. There was no dispute Alaska was paying regular compensation for sick leave; the issue was whether it was paying the sick leave from its general assets. The court held Alaska was and thus the payroll practice exemption applied; Alaska paid the benefits from its general assets, not the fund, even though the fund reimbursed Alaska for the payments. *Id.* 814–15. In so holding, the Ninth Circuit noted the Supreme Court in *Morash* also observed "'the creation of a separate fund to pay employees vacations benefits would be subject to ERISA." *Id.* at 814 (cleaned up).

Here, given the structure of the dockworkers' employment, to provide paid sick leave a separate fund would have to be established given that several employers would be responsible for sick leave and there is no immediate, default way of determining which employer would be responsible for a dockworker's paid sick leave on any given day. And, further, the dockworker employers would have to agree to a formula to determine how to allocate responsibility for the paid leave. So, the implementation of any dockworker sick leave would necessarily involve a plan for the payment of sick leave benefits and thus ERISA preempts Plaintiffs' sick leave claims as a matter of law.

The declaration of Kimberly McCarthy, a Rhode Island attorney, does not create a genuine dispute as to whether the dockworker employers could pay sick leave without the creation of an ERISA plan or otherwise out of the employers' own general assets. Ms. McCarthy attests: "Based on my experience, I have seen multiemployer groups, through an agent like PMA, provide paid sick leave to employees as a payroll practice, paid from the same operating account used to pay other wages, using employer general assets." (Dkt. No. 155-1 ¶ 18.) But this testimony does not create a genuine dispute as to whether Defendants could provide sick leave without an ERISA plan because Ms. McCarthy provides no opinion as to how that would be done in light of the

9

undisputed circumstances of the dockworkers' dispatch job assignment system and the fact PMA has no general assets.  Further, Ms. McCarthy would not be qualified to give such an opinion as at her deposition she admitted she has no personal knowledge of the dockworkers' employment circumstances, other than declarations and exhibits in this case, and has no experience with an industry which has a dispatch system similar to the dockworkers' employment.  (Dkt. No. 169-1 at 27:21-24, 28:23-32:16.)

Plaintiffs' counsel's declaration similarly does not create a genuine dispute of fact. Counsel created her own hypothetical sick leave plan that she says can be paid from an employer's general assets.  (Dkt. No. 155-2 ¶¶5-10; *id.* at 8-9.)  But, as Defendants explain, even her proposal "requires aggregating hours across all PMA member employers, pooling contributions through industry-wide assessments, and centralizing eligibility determinations and payment through PMA."  (Dkt. No. 169 at 6.)  So, even apart from her lack of qualification to design a paid sick leave plan for this industry, her declaration actually reinforces how Plaintiffs' sick leave claims require adoption of an ERISA plan and are thus preempted.

### C.  Plaintiffs' Late Request for Additional Discovery is Too Little, Too Late

Two weeks after the Court heard nearly one hour of oral argument on Defendants' summary judgment motion, Plaintiffs moved for leave to conduct additional discovery and submit a supplemental brief in opposition to Defendants' summary judgment motion.  (Dkt. No. 177.) Plaintiffs request is essentially a belated Rule 56(d) motion.  That Rule provides:

> (d) **When Facts Are Unavailable to the Nonmovant**. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;
> (2) allow time to obtain affidavits or declarations or to take discovery; or
> (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).  Plaintiffs' request fails for many reasons.

First, it is too late.  Defendants filed their motion for summary judgment in October 2025,

10

then Plaintiffs filed their initial opposition on January 30, 2026.[2]  (Dkt. Nos. 147, 155.)  Plaintiffs did not request additional time for discovery during the three-month period in which they prepared their opposition.  Nor did Plaintiffs do so before or during the hearing on Defendant's motion.  (*See generally* Dkt. No. 176.)  Instead, Plaintiff waited until two weeks after the hearing, that is, after argument was submitted and the Court took the matter under submission.  That is too late.  *See Michelle Z. v. Cal. Physicians' Serv*., No. 23-CV-05784-AMO, 2025 WL 3731841, at *17 (N.D. Cal. Dec. 26, 2025).

Second, while Plaintiffs submitted a declaration from counsel in support of their request, the declaration did not explain why Plaintiffs were unable to conduct the discovery they now seek during the months discovery was open.  *See Conkle v. Jeong,* 73 F.3d 909, 914 (9th Cir. 1995) (holding a party's failure diligently to pursue discovery is a proper ground for denying relief under Rule 56(f)).  Plaintiffs have also been on notice ERISA preemption would be an issue since Defendants removed this case to federal court on January 19, 2024.  (*See, e.g.*, Dkt. No. 1 at 125 (asserting "ERISA Preemption" as an affirmative defense to the original complaint); Dkt. No. 88 ¶¶ 86-88 (including a section of allegations titled "No ERISA Preemption") (cleaned up); Dkt. No. 142 at 58 (PMA's operative answer asserting ERISA preemption as an affirmative defense).)  Plaintiffs' reply (Dkt. No. 179) also does not adequately explain why they did not seek this discovery earlier.

***

Drawing reasonable inferences from the summary judgment record in Plaintiffs' favor, there is no genuine dispute Plaintiffs' paid-sick leave claims would require Defendants to create an ERISA plan.  Accordingly, Defendants have met their burden of showing the sick-leave claims are preempted as a matter of law.

## II.   Pandemic Pay Retaliation Claims

Defendants have not met their burden of showing Plaintiffs' Pandemic Pay retaliation claims would require adoption of an ERISA plan.  Unlike sick leave, Defendants have not shown

---

[2] Plaintiffs subsequently filed an amended opposition after the Court struck Plaintiffs' oppositions and separately-filed objections to Defendants' evidence.  (Dkt. Nos. 156, 157, 158, 159, 163.)

that pay—including bonuses—falls within ERISA's definition of an employee benefit plan.  *See* 29 U.S.C. § 1002(1) (defining "benefit plan" as a "plan, fund, or program" providing "medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services[.]").  So, even though the record shows that to make such payments Defendants would have to adopt a plan and separate fund to allocate payments among them to the excluded watchmen, Defendants have not shown that plan would fall within ERISA.

**CONCLUSION**

For the reasons explained above, Defendants' motion for summary judgment is GRANTED as to Plaintiffs' paid sick leave claims, but is DENIED as to the Pandemic Pay retaliation claims.  Plaintiffs' belated Rule 56(d) request is also DENIED.  The Court will hold a further case management conference on August 5, 2026 at 2:00 p.m. via Zoom video.  An updated joint statement is due one week in advance.

This Order disposes of Docket Nos. 147, 177.

**IT IS SO ORDERED.**

Dated: July 2, 2026

_____
JACQUELINE SCOTT CORLEY
United States District Judge